IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **ALEX ZACHARIAH,** | : | **CIVIL ACTION** |
| *Plaintiff*, | : | |
| | : | |
| v. | : | |
| | : | |
| **NORRISTOWN STATE HOSPITAL,** | : | |
| *et al.*, | : | |
| *Defendants*. | : | NO.   24-2358 |

**MEMORANDUM**

**KENNEY, J.**                                                                                        February 6, 2025

Plaintiff Alex Zachariah brings claims against his employer, Norristown State Hospital ("NSH") and NSH employees Dennis Aspinall, Tanya Pierce, Essex Christie, Jessica Keith, and Charles Solomon (the "Employee Defendants," collectively, the "Defendants"). Plaintiff alleges that, starting in May 2021, he experienced ongoing racial discrimination and retaliation after speaking out against the neglect and abuse of NSH patients. Specifically, Plaintiff brings race discrimination claims under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.* ("Title VII") (against NSH) and 42 U.S.C. § 1981 ("§ 1981") via 42 U.S.C. § 1983 ("§ 1983") (against the Employee Defendants). Additionally, Plaintiff brings retaliation claims under Title VII (against NSH) and the First Amendment via § 1983 (against the Employee Defendants).

Presently before this Court is the Defendants' Motion to Dismiss for Failure to State a Claim. ECF No. 16. For the reasons set forth below, the Court will grant the Defendants' Motion to Dismiss in part as to Plaintiff's race discrimination claims but will deny the Motion to Dismiss on both the retaliation claims. An appropriate order will follow.

I.  **BACKGROUND**

Plaintiff Alex Zachariah, an Indian-born therapist, has been employed at Norristown State Hospital as a Forensic Therapeutic Activities Worker since February 24, 2019.  ECF No. 15 ("Am. Compl.") ¶¶ 1–3.  Plaintiff alleges that he "is the only Indian-born therapist at NSH and the only therapist with an Indian accent."  *Id.* ¶ 3.  Throughout his tenure, Plaintiff claims that he was mocked by colleagues for his accent.  *Id.* ¶ 4.

NSH is a state-funded psychiatric hospital located in Norristown, Pennsylvania.  *Id.* ¶ 9.  Plaintiff alleges that he frequently reported instances of patient abuse at NSH to the Hospital's Human Resources, law enforcement, and the press, which he contends led to retaliatory conduct by his supervisors.  *Id.* ¶ 5.  Plaintiff states that this retaliation included a suspension, reprimands, threats, reassignments, and unwarranted disciplinary investigations.  *Id.* ¶¶ 6, 31, 51–53.

Plaintiff alleges that the offending conduct began in May 2021, when Plaintiff reported to NHS administration that a Forensic Security Guard ("FSG") at NSH, FSG Clayton Zuber, assaulted a patient.  *Id.* ¶¶ 19–21.  Plaintiff alleges that, a few weeks after he made the report, his supervisor, Defendant Tanya Pierce, told him that he should avoid "snitching" on FSGs.  *Id.* ¶ 22.  About two months after this initial report, in July 2021, Plaintiff was "counsel[ed]" by Defendant Dennis Aspinall, NSH Director of Therapeutic Activities, for "unsatisfactory performance" despite previously receiving a commendation for good performance at the end of May.  *Id.* ¶¶ 23–24.  Plaintiff further alleges that Defendant Aspinall "made clear" that it was frowned upon to report against security staff, specifically, "that the guards do not like people who snitch on them."  *Id.* ¶ 24.

These events culminated in Plaintiff meeting with Defendant Jessica Keith, NSH's CEO, to discuss his conversations with Defendants Pierce and Aspinall.  *Id.* ¶ 26.  Plaintiff expressed to

2

Defendant Keith "that he felt that he was being retaliated against for having reported patient abuse." *Id.* In response, Defendant Keith suggested that Plaintiff consult with non-party Iliana Ramirez, the Director of Human Resources at NSH. *Id.* Plaintiff did so, prompting an internal investigation into Plaintiff's complaints of retaliation. *Id.* ¶¶ 26–30.

Human Resources Director Iliana Ramirez procured the assistance of an outside party to conduct the investigation into Plaintiff's allegations of retaliation. *Id.* ¶ 26. During this time, Plaintiff alleges that the retaliation against him did not stop. Toward the end of July 2021, Plaintiff reported to "HR Director Ramirez that he received an anonymous phone call at work in which the caller said, 'Snitches get stitches' and then hung up." *Id.* ¶ 27. Human Resources Director Ramirez further observed Defendant Pierce "force open the door to a small office where Mr. Zachariah was printing emails that [the external investigator] had requested and aggressively yell, 'I have a right to know what you are doing. You are on the clock!'" *Id.* ¶ 28. However, after the external investigator brought in to investigate Plaintiff's claims suggested that Human Resources Director Ramirez contact the police because Plaintiff had been "threatened with physical harm," NSH took no action. *Id.* ¶ 29. NSH further refrained from acting on Plaintiff's report of a statement made by FSG Grace Thomas to Plaintiff "that he 'better watch himself' because he had 'been starting shit here.'" *Id.* ¶ 30.

Following Plaintiff's initial report of patient mistreatment, in October 2021, Defendant Aspinall transferred Plaintiff to the "far less desirable" "admissions unit," which handled new and more volatile patients. *Id.* ¶ 31. Plaintiff alleges that when he confronted Defendant Aspinall about this transfer, he was told, "It would have been better if you had reported it anonymously." *Id.*

While Plaintiff alleges that "adverse actions and hostilities…continued through the winter of 2021 into 2022," he specifically alleges that his advocacy for an Indian-born, Hindi-speaking patient in March 2022 resulted in further retaliation. *Id.* ¶¶ 32, 34–35. Plaintiff alleges that after he spoke up on behalf of the Indian patient, he was called into Defendant Aspinall's office, where Defendants Aspinall and Pierce told him "that it was not his business to watch how the guards were treating patients, and admonished him for "'putting it on the record.'" *Id.* ¶ 35. Immediately following the meeting, Defendant Pierce sent Plaintiff an email directing him to "'follow the chain of command,'" "'speak with your immediate supervisor before" reporting abuse, and "'remain focused on your responsibilities that are specific to the recreation department.'" *Id.* ¶ 35. In April 2022, Plaintiff formally submitted detailed allegations of patient abuse to Human Resources Director Ramirez, identifying specific patients and staff members, and noting that "that he intended to alert law enforcement if nothing was done." *Id.* ¶ 36.

In May 2022, Plaintiff learned that FSG Giovanni Vidal had threatened a patient, and Plaintiff assisted said patient with "prepar[ing] a written grievance and facilitat[ing] its proper filing with NSH's Program Improvement Office." *Id.* ¶ 37. Upon hearing of Plaintiff's new report regarding FSG Giovanni Vidal, another FSG, Donde Smith, threatened Plaintiff that there would be "bad consequences for" him, prompting Plaintiff to make a report to the Department of Human Services. *Id.* ¶ 38. Because NSH nurse Sue Vogelman overheard the conversation between FSG Donde Smith and Plaintiff, Plaintiff named her as a witness in the report. *Id.* NSH investigated and confirmed via phone call that FSG Donde Smith did make a threat, but NSH did not take action, because the threat was verbal and did not rise to the level of physical violence. *Id.* ¶¶ 39–40. Defendants Charles Solomon (Chief of Rehabilitation Services), Defendant Aspinall, and Defendant Pierce were present on the call. *Id.*

Seeing himself as "[h]aving nowhere else to turn," Plaintiff filed a complaint with the Pennsylvania State Police in July 2022 regarding FSG Donde Smith's threat. *Id.* ¶ 42. Plaintiff once more identified Nurse Sue Vogelman as a witness in the complaint. *Id.* In or about August 2022, the Pennsylvania Attorney General's Office interviewed Plaintiff regarding his complaint with the Pennsylvania State Police. *Id.* ¶ 42.

In September 2022, Defendants Essex Christie, another one of Plaintiff's supervisors, and Aspinall barred Plaintiff "from entering any forensic building at NSH due to an investigation being conducted into a vague allegation that Mr. Zachariah 'had harassed another employee.'" *Id.* ¶ 44. Ultimately, the investigation related to Nurse Sue Vogelman being contacted by police as a witness to FSG Donde Smith's threat against Plaintiff. *Id.* ¶ 45. At a "pre-disciplinary conference" regarding the alleged harassment of Nurse Sue Vogelman, Plaintiff "questioned why he was being subjected to this harassment without being provided any substantive allegation or evidence," to which Defendant Aspinall replied "that he 'was just doing what Charles [Solomon] told [him] to do.'" *Id.* ¶ 46 (alterations in original). Defendant Christie was also present at this meeting. *Id.*

Later that year, in November 2022, the *Philadelphia Inquirer* published an article on patient abuse at NSH, in which Plaintiff was quoted as a source. *Id.* ¶ 47. That same day, Plaintiff alleges that Defendant Christie emailed Plaintiff with a written reprimand in retaliation for speaking with the press, under the guise of being for "instigating the police to interview Sue Vogelman." *Id.* ¶ 48.

Plaintiff asserts that the retaliation continued into December 2022, when Defendant Christie issued Plaintiff a second written reprimand for "giving a cookie to one of his patients three months earlier" because the patient was food restricted, unbeknownst to Plaintiff. *Id.* ¶ 50. Also this month, Defendants Aspinall and Christie "issued a directive that Mr. Zachariah discontinue

5

all patient contact and precluded him from entering any building in which patients were present," on the grounds that a female patient accused Mr. Zachariah of photographing her. *Id.* ¶ 51. Plaintiff alleges that Defendants Aspinall and Christie were aware that, at this time, Plaintiff "did not have any female patients in his charge." *Id.*

Plaintiff was thereafter reassigned to sorting clothing and patient belongings in the basement of NSH, which Plaintiff alleges "was filled with trash, rodent droppings, and even had a rat carcass on the floor." *Id.* ¶ 52. It was not until Plaintiff's union stewards intervened that Plaintiff was moved to the first floor of NSH, where he was tasked with "sorting plastic cutlery," a task Plaintiff alleges is "typically assign[ed] to patients in partial recovery who are paid minimum wage for their work," and where he worked for nearly five months. *Id.* ¶¶ 52–54. Plaintiff was permitted to resume working with patients in April 2023 after "the alleged infraction was determined to be 'unfounded.'" *Id.* ¶ 54.

While still barred from working with patients, on March 15, 2023, Plaintiff filed an Equal Employment Opportunity Commission (EEOC) complaint alleging race discrimination and retaliation against NSH. *Id.* ¶ 56. Less than eight weeks later, on June 13, 2023, Plaintiff was suspended without pay for over three months, allegedly based on false accusations that he abused patients on a date when he was not present at NSH. *Id.* ¶¶ 59–61. Plaintiff alleges that Defendants Solomon, Aspinall, Keith, and Christie participated in the decision to suspend Plaintiff, with Defendant Keith signing the written suspension papers. *Id.* ¶ 13, 75. Plaintiff claims that this suspension caused him severe emotional distress and significant financial hardship. *Id.* ¶ 62.

Following his suspension, Plaintiff was eventually "cleared of any wrongdoing and reinstated," but he alleges that "he will doubtless continue to face the same Kafka-esque campaign of discrimination and retaliation from Defendants." *Id.* ¶¶ 62–63.

On May 31, 2024, Plaintiff requested a notice of right to sue from the EEOC. *Id.* ¶ 67. On that same day, he filed his Original Complaint with this Court. ECF No. 1. With the Defendants' consent, Plaintiff filed his Amended Complaint on September 20, 2024. ECF No. 15. As of September 11, 2024, Plaintiff had not yet received the right-to-sue letter, but the EEOC investigator assigned to his case affirmed that "he had recommended the issuance of a right-to-sue letter." *Id.* ¶ 68. Defendants filed their Motion to Dismiss on October 4, 2024, ECF No. 16, and the Motion is fully briefed as of November 19, 2024. ECF Nos. 18, 19.

## II.   LEGAL STANDARD

Federal Rule of Civil Procedure 12(b)(6) allows a party to move for dismissal of a complaint for failure to state a claim upon which relief can be granted. A motion to dismiss under Rule 12(b)(6) tests "the sufficiency of the allegations contained in the complaint." *Kost v. Kozakiewicz*, 1 F.3d 176, 183 (3d Cir. 1993) (citation omitted). "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Zuber v. Boscov's*, 871 F.3d 255, 258 (3d Cir. 2017) (internal quotation marks and citation omitted). A complaint is plausible on its face when the plaintiff pleads a factual contention that "allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). Additionally, courts must "construe the complaint in the light most favorable to the plaintiff, and determine whether, under any reasonable reading of the complaint, the plaintiff may be entitled to relief." *Fowler*, 578 F.3d at 210 (quoting *Phillips v. Cnty. of Allegheny*, 515 F.3d 224, 233 (3d Cir. 2008)).

A complaint need not establish a prima facie case to survive a motion to dismiss. *Connelly v. Lane Constr. Corp.*, 809 F.3d 780, 788 (3d Cir. 2016). Instead, Plaintiffs need only "put forth allegations that raise a reasonable expectation that discovery will reveal evidence of the necessary

element," *Fowler*, 578 F.3d at 213 (citation omitted), and "must give the defendant fair notice of what the plaintiff's claim is and of the grounds upon which it rests," *Bayer v. Pocono Med. Ctr.*, No. 3:13-1900, 2014 WL 3670499, at *4 (M.D. Pa. July 23, 2014) (citing *Erickson v. Pardus*, 551 U.S. 89, 93 (2007)).

### III.   DISCUSSION

Plaintiff has failed to state a claim for race discrimination under Title VII and § 1981 and those claims will be dismissed as to all Defendants without prejudice.  However, Plaintiff has plausibly pleaded retaliation under both Title VII and the First Amendment via § 1983. Accordingly, the retaliation claims will proceed to discovery.

#### A. Race Discrimination Under Title VII and 42 U.S.C. § 1981

Defendants argue that Plaintiff fails to plead sufficient facts to state a claim of employment discrimination on the basis of race under Title VII or § 1981.  ECF No. 16-1 at 5–8.  Specifically, Defendants argue that "nothing alleged in the Amended Complaint shows that an adverse employment action occurred under circumstances reflecting an inference of intentional race discrimination." *Id.* at 6.  As further explained below, this Court agrees.

To state a claim for employment discrimination under both Title VII and § 1981, a plaintiff need show that "1) [he] is a member of a protected class, 2) [he] was qualified for the position [he] sought to attain or retain, 3) [he] suffered an adverse employment action, and 4) the action occurred under circumstances that could give rise to an inference of intentional discrimination." *Vaughan v. Boeing Co.*, 733 F. App'x 617, 622 (3d Cir. 2018) (quoting *Mandel v. M & Q Packaging Corp.*, 706 F.3d 157, 169 (3d Cir. 2013)) (alterations in original).

An "adverse employment action" is "an action by an employer that is serious and tangible enough to alter an employee's compensation, terms, conditions, or privileges of employment,"

*Mieczkowski v. York City Sch. Dist.*, 414 F. App'x 441, 445 (3d Cir. 2011) (internal quotation marks omitted), such as "hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits," *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 761 (1998).

An adverse employment action may induce an inference of discrimination when a plaintiff alleges that the defendant "treated similarly situated employees outside of [plaintiff's protected] class more favorably," *Groeber v. Friedman & Schuman, P.C.*, 555 F. App'x 133, 135 (3d Cir. 2014), or where there is "evidence of similar racial discrimination of other employees, or direct evidence of discrimination from statements or actions by her supervisors suggesting racial animus," *Golod v. Bank of Am. Corp.*, 403 F. App'x 699, 702 n.2 (3d Cir. 2010) (citing *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 511–12 (2002)).

Here, Plaintiff has met his pleading burden on the first three elements. First, Plaintiff is a member of a protected class—he identifies as Indian. Am. Compl. ¶ 3. Second, although Plaintiff does not specifically plead that he was qualified for his position, Plaintiff is still employed by NSH today. *Id.* ¶ 63. The Court can reasonably infer that his continued employment evidences that he is qualified for his position at NSH. Third, Plaintiff pleads that he was subject to various adverse employment actions, including suspension without pay and reassignment to "sort clothes in a filthy basement or assemble high volume plastic cutlery packets under close supervision," performing duties removed from his position as a therapist. *See, e.g.*, *id.* ¶¶ 3, 51, 56, 76.

However, Plaintiff has failed to adequately plead facts regarding the fourth element, that is, that these adverse employment actions occurred under circumstances that give rise to an inference of racial discrimination. In fact, Plaintiff's complaint is largely devoid of particularized allegations referencing his race aside from a handful of allegations. First, Plaintiff asserts that he

9

is part of a racial minority and that "NSH colleagues have mimicked and mocked his accent," *id.* ¶¶ 3–4, but fails to tie this allegation to any adverse action taken by the *Defendants*. *See Ezold v. Wolf, Block, Schorr & Solis-Cohen*, 983 F.2d 509, 545 (3d Cir. 1992) ("Stray remarks by non-decisionmakers or by decisionmakers unrelated to the decision process are rarely given great weight, particularly if they were made temporally remote from the date of decision.").

Further, Plaintiff alleges that he "spoke up on behalf of a patient who, like him, was Indian-born and" was subsequently chastised for it by Defendant Aspinall and Defendant Pierce, *id.* ¶¶ 34–35.  Plaintiff's apparent associational discrimination claim is similarly unavailing.  Generally, "courts have limited associational discrimination claims under Title VII to causes of action which involved more substantial relationships," such as familial or spousal relationships. *Larochelle v. Wilmac Corp.*, 210 F. Supp. 3d 658, 693 (E.D. Pa. 2016) (citing cases), *clarified on denial of reconsideration*, No. 12-CV-5567, 2016 WL 6135577 (E.D. Pa. Oct. 21, 2016), *aff'd*, 769 F. App'x 57 (3d Cir. 2019) (unpublished).  Here, Plaintiff was speaking up in favor of a patient, indicating a more tenuous relationship than what is typically needed for an associational discrimination claim to survive a motion to dismiss.  This allegation also cannot be read out of context of the entire Amended Complaint, which alleges that Defendants violated Plaintiff's rights following a series of similar incidents unrelated to the patient's ethnic or racial background.  In any event, however, Plaintiff again fails to show how his speaking up for the Indian patient contributed to any of his proffered adverse employment actions.

Finally, Plaintiff appears to make a comparator argument when he alleges that "no white therapist at NSH has been singled out for sham disciplinary proceedings and unapologetically justified discipline the way Mr. Zachariah has, despite his overall good job performance," *id.* ¶ 64, but there is no comparator here.  To adequately allege a comparator, Plaintiff would need to

identify "a similarly situated individual outside of the protected class, who engaged in the same conduct but was treated more favorably." *Mandel*, 706 F.3d at 170.  Plaintiff has failed to do so.

Overall, the crux of the Amended Complaint has nothing to do with race, but with Plaintiff being viewed as a "snitch" and being penalized for speaking out on behalf of patients. Accordingly, because Plaintiff has failed to adequately plead that any adverse employment action taken against him was *because of* his race, the race discrimination claims under Title VII and § 1981 are dismissed as to all Defendants without prejudice.

### B. Title VII Retaliation (Against NSH)

Plaintiff has adequately pled a retaliation claim under Title VII.  To establish a Title VII retaliation claim, a plaintiff must show that (1) he engaged in "protected activity"; (2) "the employer took an adverse employment action against [him]"; and (3) "there was a causal connection between [his] participation in the protected activity and the adverse employment action." *Selvato v. SEPTA*, 658 F. App'x 52, 56 (3d Cir. 2016).  Defendants do not contest that Plaintiff engaged in protected activity when he filed the EEOC complaint.  ECF No. 16-1 at 2 ("For the Title VII retaliation claim, there is only one activity alleged protected by Title VII—his EEOC complaint in March 2023").  Defendants further do not appear to seriously contest that Plaintiff's June 2023 suspension constitutes an adverse employment action, and instead take issue with the causal connection between the EEOC Complaint and suspension. *See id.* at 9.  Therefore, only the third element appears to be in dispute and will be addressed in turn.

A Plaintiff may establish causation "by proffering evidence of an employer's inconsistent explanation for taking an adverse employment action, a pattern of antagonism, or temporal proximity unusually suggestive of a retaliatory motive." *Carvalho-Grevious v. Delaware State U.*, 851 F.3d 249, 260 (3d Cir. 2017) (internal citations and quotations omitted).  While close

11

temporal proximity between a plaintiff's protected activity and the alleged adverse employment action can be sufficient to establish causality, "[t]he mere passage of time is not legally conclusive proof *against* retaliation." *Robinson v. SEPTA*, 982 F.2d 892, 894 (3d Cir. 1993) (emphasis added).

Plaintiff alleges that "[l]ess than eight weeks after Mr. Zachariah engaged in the protected activity of filing a discrimination complaint with the EEOC, NSH suspended Mr. Zachariah for more than three months without pay." Am. Compl. ¶ 56. Defendants argue that two months is too tenuous a time frame to establish causation between the EEOC complaint and Plaintiff's suspension. *See* ECF No. 16-1 at 8–9. However, taking Plaintiff's allegations as true, the Court finds that suspending Plaintiff for three months, unpaid, to investigate allegations of abuse that took place on a day that Plaintiff was not working at NSH can reasonably be seen as an "inconsistent explanation" for the adverse employment action. Am. Compl. ¶¶ 56, 60–61. Therefore, the Court will permit Plaintiff's Title VII retaliation claim to proceed.

### C. First Amendment Retaliation via § 1983 (Against Individual Defendants)

Plaintiff has adequately pled a First Amendment Retaliation claim, actionable under § 1983. Defendants do not dispute this. *See* ECF No. 16 at 8 ("Defendants do not dispute at this stage—where Plaintiff's allegations are entitled to great deference—that the Amended Complaint avers claims of retaliation based constitutionally protected conduct…."). To establish a First Amendment retaliation claim pursuant to § 1983, a plaintiff need show that "(1) he engaged in constitutionally protected conduct, (2) the defendant engaged in retaliatory action sufficient to deter a person of ordinary firmness from exercising his constitutional rights, and (3) a causal link [existed] between the constitutionally protected conduct and the retaliatory action." *Baloga v. Pittston Area Sch. Dist.*, 927 F.3d 742, 752 (3d Cir. 2019) (internal quotations omitted). "[T]he

First Amendment protects a public employee's right, in certain circumstances, to speak as a citizen addressing matters of public concern." *Garcetti v. Ceballos*, 547 U.S. 410, 417 (2006). Put differently, for First Amendment protection to attach, "a plaintiff's activity ordinarily must not have been undertaken pursuant to his job responsibilities as a public employee." *Falco v. Zimmer*, 767 F. App'x 288, 300–01 (3d Cir. 2019).

Here, Plaintiff pleads that his "numerous reports about patient abuse, threats to his safety, and efforts to retaliate and silence him are matters of public concern and are protected under the First Amendment" and that these "statements were not made pursuant to his official duties as a recreational therapist." Am. Compl. ¶¶ 80–81. Although the Court does not agree that every one of Plaintiff's "reports about patient abuse [and] threats to his safety" can be the basis for his First Amendment retaliation claim, the Court agrees with both the Plaintiff and Defendants and finds at this juncture that Plaintiff has sufficiently alleged that he spoke "as a citizen addressing matters of public concern." *Garcetti*, 547 U.S. at 417. Accordingly, Plaintiff's First Amendment Retaliation Claim will proceed.

## IV. CONCLUSION

For the foregoing reasons, the Court will grant Defendant's Motion to Dismiss in part and deny it in part. Plaintiff's race discrimination claims under Title VII and § 1981 are hereby dismissed without prejudice as to all Defendants. Plaintiff's retaliation claims under Title VII and § 1983 will proceed to discovery. An appropriate order will follow.

**BY THE COURT:**

**/s/ CHAD F. KENNEY**

**CHAD F. KENNEY, JUDGE**